# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| LETICIA AGUINAGA, | Case No.: 4:12-cv-00445-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Respondent. | |

Pending before this court is Leticia Aguinaga's Petitioner for Review (Docket No. 1), seeking review of the Social Security Administration's final decision to deny her claim for Disability Insurance Benefits and Supplemental Security Income payments. The action is brought pursuant to 42 U.S.C. § 405(g). Having carefully reviewed the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On or around January 11, 2005, Leticia Aguinaga ("Petitioner") protectively filed an application for Disability Insurance Benefits and Supplemental Security Income, alleging a disability onset date of January 1, 2000 (later amended to January 1, 2004). Petitioner's claim was initially denied on June 16, 2005 and, again, on reconsideration on October 17, 2005. On or around November 7, 2005, Petitioner timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On March 22, 2007, ALJ John C. Arkoosh held a hearing in Twin Falls, Idaho, at which time Petitioner, represented by attorney Michael McCarthy,

**MEMORANDUM DECISION AND ORDER - 1**

appeared and testified.  An impartial vocational expert, James Grissom, and Petitioner's husband, Julio Aguinaga, Jr., also appeared and testified.  Following the hearing, the ALJ requested that Petitioner submit to a consultative psychological exam, which she did on July 16,2007.

On October 31, 2007, the ALJ issued a decision denying Petitioner's claims, finding that Petitioner was not disabled within the meaning of the Social Security Act.  Petitioner timely requested review from the Appeals Council on December 3, 2007.  Additional evidence was submitted to the Appeals Council on October 19, 2009.  On February 23, 2010, the Appeals Council denied Petitioner's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security.

Petitioner then filed an action in this Court on April 19, 2010.  The parties stipulated to a remand to allow the Appeals Council to consider new evidence and, on November 22, 2010, the action was remanded.  On January 18, 2011, the Appeals Council denied Petitioner's request for review.  On January 31, 2011, Petitioner moved the Appeals Council to reconsider its decision to deny further review or, alternatively, to extend the time to commence a civil action.  A second motion to extend the time to commence a civil action was filed with the Appeals Council on July 26, 2011.  A third motion to extend the time to commence a civil action was filed with the Appeals Council on April 27, 2012.  On July 27, 2012, the Appeals Council apparently denied Petitioner's motion for reconsideration, but extended the time to commence a civil action.

Having exhausted her administrative remedies, Petitioner timely files the instant action, arguing that (1) the ALJ failed to cite clear and convincing reasons for rejecting Petitioner's pain testimony; and (2) the ALJ erred in evaluating the opinion of Petitioner's treating nurse

**MEMORANDUM DECISION AND ORDER - 2**

practitioner.  *See* Pet.'s Brief, p. 3 (Docket No. 19).  Petitioner therefore requests that this Court reverse the ALJ's decision or, alternatively, remand the case for further proceedings.  *See id*. at p. 10; *see also* Pet. to Review, p. 4 (Docket No. 1).

## II. <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards.  42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990).  Findings as to any question of fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The standard requires more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ.  *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019.  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony

(*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Where the evidence is susceptible to more than one rational interpretation in a disability proceeding, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ.  *Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error.  *Matney*, 981 F.2d at 1019.  The ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis in law.  *See id*.  However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute."  *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## III.  DISCUSSION

### A.  Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) - or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) - within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  SGA is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work

**MEMORANDUM DECISION AND ORDER - 4**

activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental impairments are and regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner has not engaged in substantial gainful activity since January 1, 2004, the amended alleged disability onset date. (AR 24).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521, 416.921. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Petitioner had the following severe impairments: (1) degenerative disc disease of the lumbar spine; and (2) fibromyalgia. (AR 25).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R.

Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *Id.*  Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments.  (AR 25).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity is sufficient for the claimant to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. §§ 404.1545, 416.945.  Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  Here, the ALJ determined that Petitioner has the residual functional capacity to perform work-related activities with the following restrictions: (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) sit for a total of about six hours in an eight-hour workday; (3) stand/walk for a total of about six hours in an eight-hour workday; (4) frequently climb stairs and ramps, but never climb ladders, robes, or scaffolds; (5) frequently balance, kneel, and crawl; (6) occasionally stoop and crouch; and (7) avoid concentrated exposure to vibration.  (AR 25-31).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the claimant is able to do other work, she is not disabled; if the claimant is not able to do other work and meets the duration requirement, she is disabled. Here, the ALJ found that Petitioner is capable of performing past relevant work as a fast food worker and as a cashier II because, according to the ALJ, such work does not require the performance of any work activities precluded by Petitioner's residual functional capacity. (AR 31).

**B.     Analysis**

1.     Petitioner's Credibility

Petitioner vigorously contests the ALJ's conclusion that her testimony surrounding the degree of her alleged pain is not entirely credible. *See* Pet.'s Brief, pp. 3-9 (Docket No. 19). As the trier of fact, however, the ALJ is in the best position to make credibility determinations and, for this reason, his determinations are entitled to great weight. *See Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir. 1990). In evaluating a claimant's credibility, the ALJ may consider claimant's reputation, inconsistencies either in testimony or between testimony and conduct, daily activities, past work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the alleged symptoms. *See Light v. Social Security Admin.*, 119 F.3d 789, 791 (9th Cir. 1997). In short, "[c]redibility decisions are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). Even so, however, to reject a claimant's testimony (absent evidence of malingering) requires that the ALJ make specific findings stating

clear and convincing reasons for doing so.  *See Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th

Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

Petitioner contends that medical evidence exists in the record to diagnose medical

conditions likely to cause the pain she experiences.  *See* Pet.'s Brief, p. 6 (Docket No. 19) ("The

record contains numerous citations to these signs, symptoms, and co-occurring conditions.").

The ALJ's decision, however, does not disagree with such a notion.  Indeed, the ALJ found

Petitioner to be suffering from several severe impairments (degenerative disc disease of the

lumbar spine and fibromyalgia) that not only "impose more than a minimal effect on the

claimant's ability to perform basic work activities," but also "could reasonably be expected to

produce the alleged symptoms."  (AR 25-30).  It is what the ALJ goes on to state that Petitioner

objects to – namely, that "[Petitioner's] statements concerning the intensity, persistence, and

limiting effects of these symptoms are not entirely credible."  (AR 30).

During the March 22, 2007 hearing, Petitioner extensively testified about the extent of

her pain and associated physical restrictions, stating in relevant part:

> Q:    Okay.  In the best of all possible worlds, in the best of all
>       ideal worlds, is there a job out there that you feel you could
>       do with your limitations and do it on a competitive basis eight
>       hours a day, five days a week?
>
> A:    I feel at this time, no.
>
> Q:    Okay.  And why is that?
>
> A:    Because I'm always in pain.
>
> Q:    Okay.  And where do you hurt?
>
> A:    All through my back and my legs. . . . .
>
> Q:    And is that an everyday hurt?

**MEMORANDUM DECISION AND ORDER - 8**

A:     It is.

Q:     All day?

A:     Yes. . . . .

Q:     Okay.  On a scale of 1 to 10, 1 is no pain or minor pain, 10's excruciating pain, the worst pain you can think of, pain so bad, in fact, you'd have to go to the hospital emergency room – you tell me 10, I want to see some emergency room records. On that scale of 1 to 10, I'm going to ask you about good days, bad days, average days.  On an average day, how would you rate the pain in your low back, legs on that scale of 1 to 10 average day?

A:     9 to 10.

Q:     That's an average day? . . . .

A:     That's the pain that I have every day. . . . .

Q:     Is there anything else you can tell me about your back, your legs that we haven't discussed?

A:     It just eliminates me to do a lot of stuff at the house for my husband, for my kids, for myself.  I don't live a normal life. . . . .

Q:     Okay.  Ma'am, can you take care of your personal needs? You can bathe yourself, feed yourself, clothe yourself, those sorts of things?

A:     I have a hard time with my hygiene.

Q:     Okay.

A:     And to – well, to dress somewhat.

Q:     Somebody has to help you with those things?

A:     Well, I have a hard time like putting on my bra.  I do it myself, but it hurts to stretch my arms back like that.

Q:     Okay.  Tell me about the housework that you do.  Do you do the dishes?

A:     My husband does the dishes.  Off and on, I'll just load up the dishwasher sometimes, but not very often.

Q:     Okay.  Laundry?

A:     My husband does the laundry.

Q:     Cooking?

A:     I'll do some cooking.

Q:     Shopping?

A:     I'll go shopping sometimes, but I always have somebody with me to load the groceries . . . . because I've tried, you know, grabbing the bags and stuff and I'm in a lot of pain the next day.

Q:     Dusting, sweeping, vacuuming, mopping?

A:     I've tried all that and it just aggravates my pain.

Q:     Well, who does it if you don't do it, your husband?

A:     My husband does and my son.

Q:     What do you do for fun or for recreation?  What is it that you have for social activities?

A:     All I do is go to church, but I –

Q:     Okay.  Well, how often do you go to church? . . . .

A:     We go every Sunday.

Q:     How long's the service?

A:     An hour.

Q:     Any problems getting through the service?

A:      Very difficult.

Q:      What kind of problems do you have?
A:      I have to keep sitting or I have to try to hold myself up because I feel like a lot of pain and then I feel weak, so I'm always – try to make myself comfortable.

Q:      Do you have people that you visit or visit you on a regular basis, family, relations, friends?

A:      I don't.

Q:      In a typical day, how much television do you watch? . . . .

A:      No more than two [hours].

Q:      Any reading?

A:      I don't read. . . . .

Q:      Who does the yard or garden work at home?

A:      My husband and my son. . . . .

Q:      Tell me about a typical day for you from the time you get up in the morning until the time you go to bed at night.  What time is it you get up in the morning?

A:      About 9:30.

Q:      And once you're up, what do you do?

A:      Well, I get up slowly and my daughter she's still asleep.  She goes to school until 12:10, so I get up slowly and I go take a shower and I go take my medication and I'll go sit on the sofa for a little bit because when I get up, I have – it's hard to walk and my balance isn't very good either.

Q:      So what are you doing then?  You get up, you –

A:      I'll just sit on the – I'll – I rub myself.  I'll sit – I'll go sit on the sofa and I'll rub myself until I can get up and go get dressed.

Q:      Okay.  And once you're dressed, what do you do?

A:      And then in between, I just sit and then when I have a lot of pain, I'll get up again and I'll get my daughter's clothes ready and she can dress herself and then I'll just –

Q:      And then, what, she goes to school at 12?

A:      Yeah.

Q:      What are you doing in the afternoon?

A:      In the afternoon, I just – I stay home.  I don't do much.

Q:      Well, what are you doing when you're home, just sitting there?

A:      Just watch TV or if there's little things I can do like put the dishes away or make – fix my daughter's room, maybe some clothes, but the bending and all that, just it hurts me.

Q:      Okay.  What else are you doing in the afternoon, anything?

A:      Not much at all.

Q:      What time's your daughter home?

A:      She gets home until 3:30.

Q:      After 3:30, what are you doing?

A:      Basically I'm home and there's dinner and so I'll just serve her because my son can serve himself.  And then my husband gets off at five.

Q:      Okay.  What happens after five?

A:      We have dinner together.  We sit there. . . . .  We just talk.

Q:      And after dinner?

A:      After dinner, I'll sit with him again and then I'll go take a bath.

**MEMORANDUM DECISION AND ORDER - 12**

Q:      Okay.  Then what?

A:      Then I'll – my husband rubs me.  Before I go to bed, I'll take my mediation.

Q:      What time's bed?

A:      I go to sleep like at 8:30.  And through the day, I'm taking my medication. . . . .

Q:      Okay.  How long can you comfortably sit at a time before you need to stand up?

A:      While I'm sitting like on the sofa, I move around a lot.  I never can find a comfortable –

Q:      Well, try to focus on the question. . . . .  Assume a comfortable chair, not the sofa, comfortable chair, how long can you comfortably sit before you'd need to stand up?

A:      30 minutes.

Q:      How long can you comfortably stand before you need to sit down?

A:      No more than 20 [minutes].

Q:      Assume you're on task at a work station, you can sit or stand as you want to or need to.  You get tired of sitting, you can stand; stand and you can sit.  It's up to you.  You can do one or the other, but you're there for an eight hour day.  You have a 15-minute break in the morning, one in the afternoon, lunch hour between.  Could you get through an eight hour day of sitting and standing?

A:      No.

Q:      Why is that?

A:      Because of my pain.

Q:      Okay.  Would you need to lie down?

A:      I would.

**MEMORANDUM DECISION AND ORDER - 13**

Q:      Okay.  Well, if you're allowed to lie down at the breaks, the 15 minutes in the morning and the 15 minutes in the afternoon and the lunch hour, could you get through an 8 hour day of sitting and standing?

A:      That wouldn't be enough. . . . .

Q:      From the time you get up in the morning until the time you go to bed at night, how much time do you spend resting, reclining, and lying down?

A:      About four to six hours.

Q:      Okay.  How far can you comfortably walk at a time?

A:      Not very far.

Q:      Well, how far is not very far, a block, two blocks, football field?

A:      I don't even know what a block is.  I didn't finish school, so I don't know.

Q:      Okay.  Well, let's talk about a football field.  Let's define that.  I think it's 100 yards.  Can you walk 100 yards?

A:      No.

Q:      Half a football field, 50 yards?

A:      Comfortably, no.

Q:      A quarter of a football field, 25 yards? . . . .

A:      Yeah, I can walk, but not very far.  I mean I would have to sit down because I . . . have a lot of pain. . . . .

Q:      Ma'am, it's better you guess at it than I guess at it.

A:      Like I know I can't walk no more than I guess a block or, I don't know.

Q:      Okay.  But we're not sure how far a block is. . . . .  How far do you think a block is?

A:      [More than the length of the room].

Q:      This room?  Yes, okay.  Assume a weight in front of you on the table there, what would be the heaviest weight you could comfortably lift from a standing position using both arms, both hands, you pick it up, you set it down, heaviest weight one time lift comfortably?

A:      About four pounds. . . . .

Q:      Can you lift a gallon of milk?

A:      It's all – if I lift it, I'll be in pain.  I'm sorry if I don't make sense. . . . .

Q:      Can you bend over and touch your toes?

A:      No.

Q:      Can you bend over and touch your knees?

A:      No.

Q:      If I drop this pen on the floor, could you squat down, bend your knee, get down, pick the pen up, and get back up?

A:      No.

Q:      How many steps or flights of steps can you climb at one time before you have to stop because you're hurt, tired, out of breath, or for some other reason?

A:      No more than three [steps]. . . . .

Q:      Any problems with your arms as far as pushing and pulling, say you were pushing and pulling the levers of a piece of equipment and doing that on a continuous and repetitive basis?

A:      Yes.

**MEMORANDUM DECISION AND ORDER - 15**

Q:     You can do that?

A:     I can't.

Q:     You can't.  Would that bother your back after a while?

A:     It does.

Q:     Any problems with fine manipulations of fingers of either hand?  Can you pick a coin up off the tabletop with either hand?

A:     I feel my hand's weak.  I can pick up stuff, but I feel my hand's weak.

Q:     Why are your hands weak?

A:     Because of my back pain. . . . .

Q:     Any problems with operating foot controls, say the foot controls of an automobile?

A:     Yes I do. . . . .  My right leg it hurts to do pressure on stuff.

Q:     Okay.  Do you have a driver's license?

A:     I do.

Q:     Any restrictions on there?

A:     No.

Q:     Do you have a car that you drive?

A:     I do.

Q:     In the last six months, what's the longest period of time you've operated an automobile at one set? . . . .

A:     I've just stayed locally where I live in Paul or Burley [– about 10 miles apart].

(AR 422-426, 429-441).


**MEMORANDUM DECISION AND ORDER - 16**

In other words, Petitioner describes herself as a nearly incapacitated individual in constant pain. However, contrasted against the balance of medical evidence in the record, the ALJ questioned Petitioner's credibility on the extent of her allegedly disabling symptoms.

First, the ALJ pointed out that, while Petitioner alleges disability from any and all work since January 1, 2004 (her alleged disability onset date), "the medical evidence documents no complaints of back pain, or any other pain, until January 2005." (AR 30). The ALJ properly considered this absence of objective medical evidence, despite Petitioner's claims to the contrary, when assessing her credibility. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (lack of medical evidence cannot form sole basis for discounting pain testimony, but can be considered by ALJ in credibility analysis).[1] Relatedly, the ALJ noted that Petitioner's "pain complaints . . . have been markedly out of proportion to the objective medical evidence . . . ." (AR 30). For example:

- February 8, 2005: Clinton L. Dille, M.D. observed that Petitioner's symptoms "obviously far exceed what one would expect from a herniated L5-S1 disc." (AR 286).[2]

---

[1] Petitioner disagrees with the ALJ's justification in this respect, countering that "[t]here are several references to complaints of pain prior to January, 2004," and then highlighting medical records dated March 2, 1999, March 12, 1999, April 6, 1999, September 12, 2001, September, 21, 2001, and July 7, 2002. *See* Pet.'s Brief, pp. 3-4 (Docket No. 19). This misses the point. Not only do these references cut against Petitioner's original alleged disability onset date (January 1, 2000), they are immaterial toward discerning whether Petitioner was disabled for the years between January 2004 and January 2005.

[2] The undersigned has considered Petitioner's rejoinder that Dr. Dille was not necessarily commenting upon her credibility but, rather upon the cause (a herniated L5-S1 disc or something else) of her alleged pain. *See* Pet.'s Brief, pp. 7-8 (Docket No. 19) (citing AR 286) ("This patient's generalized pain, including the upper and lower extremities seems to point to a more central etiology for her pain" while recommending "a neurological consultation to evaluate for fibromyalgia or multiple sclerosis."). Even so, such a statement cannot be considered in isolation but, instead, alongside the rest of the record (including subsequent imaging results)

**MEMORANDUM DECISION AND ORDER - 17**

- February 23, 2005: Samuel S. Jorgenson, M.D. reviewed Petitioner's cervical MRI and found "very minimal spondylosis and disc bulging"; "no herniation"; "neural foramina are all patent"; and "some minimal flattening of cervical lordosis." (AR 301). Accordingly, Dr. Jorgenson concluded that he "cannot account for [Petitioner's] thoracic pain based on her MRI scan." *Id.*

- March 9, 2005: Dr. Jorgenson reevaluated Petitioner, stating that he "cannot account for any right-sided symptoms based on [Petitioner's] MRI scan" and "[s]he does not have any obvious neurologic impingement of this." (AR 292).

- June 3, 2005: Despite Petitioner reporting that her pain was constantly at level "10" on a scale of 10, Richard Hammond, M.D. indicated that "[s]he does not appear to be in any significant distress in the waiting room nor walking into the exam room nor during the interview." (AR 323); *see also* (AR 324) ("She said her pain was 10 out of 10 the entire time yet she did not seem all that uncomfortable during the interview.").

- September 29, 2005: Joseph R. Petersen, M.D. examined Petitioner,[3] noting "relatively normal ranges of motion" while also commenting that, because no other medical providers have been able to find an etiology of her pain (and given his history with Petitioner), he "didn't think it would be of any advantage to . . . repeat many x-rays and etc. that have been done by other people on her." (AR 357).

_____

which, as the ALJ posits, paints the picture of someone whose subjective complaints do not align with the objective medical evidence contained in the record.

[3] Apparently, Petitioner was also Dr. Petersen's patient that he "had seen a long time ago." (AR 357). According to Dr. Petersen's less-than-gracious, but relevant in the context here, chart notes:

> [Petitioner] was really a problem from the very beginning when we saw her. She had an injury to her back that ended up with an MRI and also her neck. Every time we turned around she had pain some place. Before we got through we ended up sending her off to Dr. Hammond, who sent her off to Dr. Mitgang. She wanted to see Schossburger in Pocatello when this whole thing started. She had seen multiple doctors for her problems. This all occurred in 1998.

*Id.*

**MEMORANDUM DECISION AND ORDER - 18**

- <u>September 6, 2006</u>: Petitioner complained of (1) "chronic low back pain with radiation to the right leg especially into the right groin" that "has gotten a lot worse since yesterday"; (2) "pain . . . so severe that she has had nausea, vomiting, and diarrhea due to the pain"; and (3) worsening depression "since the pain has been getting worse." (AR 384). Still, the medical provider observed that Petitioner appeared to be only "[i]n mild distress from discomfort." *Id*.

- <u>September 25, 2006</u>: Petitioner reports that "her pain is greater than 10:10," but the medical provider states that she is "alert and oriented" and in only "mild distress." (AR 383).

- <u>July 16, 2007</u>: During a consultative psychological examination, LoriLee Critchfield, Ph.D., commented that Petitioner "demonstrated a smooth, well-coordinated gait with upright posture, and showed no difficulties" and "seemed to sit very comfortably and showed no indication of pain." (AR 400 & 402). Dr. Critchfield further opined that "[s]ustained employment may be possible at this time." (AR 404).

These instances, considered separately, may not conclusively rebut Petitioner's claims of disabling pain. However, along with the other reasons offered by the ALJ, they collectively support the ALJ's conclusions concerning Petitioner's credibility. *See* 20 C.F.R. § 416.929(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence."); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding that "contradictions between claimant's testimony and the relevant medical evidence" provided clear and convincing reason for ALJ to reject plaintiff's subjective symptom testimony).[4]

---

[4] Petitioner spends a significant period of time citing to evidence in the record reflective of fibromyalgia. *See* Pet.'s Brief, pp. 4-7 (Docket No. 19) ("The record contains numerous citations to these signs, symptoms, and co-occurring conditions."). The ALJ's decision, however, cannot be interpreted as disagreeing with such a diagnoses; indeed, he affirmatively found that Petitioner had two severe impairments, including fibromyalgia, that could contribute to her alleged pain symptoms. (AR 25 & 30). To the extent records secured after the ALJ's

**MEMORANDUM DECISION AND ORDER - 19**

Second, the ALJ made reference to Dr. Hammond's assessment that, owing to Petitioner's "profound giveaway weakness throughout her entire exam," there seems to be "significant embellishment of her symptoms." (AR 324); *see also* (AR 323) ("Motor is profound giveaway through all muscle groups tested. Just placing my hand on her left knee without even pushing down is enough pressure to cause her to giveaway at the hips bilaterally. She said that amount of pressure caused her to have pain in her low back."). Such exaggerations support a negative credibility determination. *See, e.g.*, *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (credibility determination based on, among other things, petitioner's "tendency to exaggerate" proper when supported by "substantial evidence."); *Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001) (upholding ALJ's adverse credibility determination because, *inter alia*, claimant's activities of daily living were self-limited); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (claimant's "fail[ure] to give maximum or consistent effort during two physical capacity evaluations" supported ALJ's adverse credibility determination).[5]

---

October 31, 2007 decision support a disability determination during a different period of time, Petitioner is free to submit a new application accordingly. However, because such records do not speak specifically to the time period discussed within the ALJ's decision, it cannot be said that the decision's rationale is without appropriate justification.

[5] It can be argued – as Respondent does – that Petitioner was malingering. *See* Resp.'s Brief, pp. 7-8 (Docket No. 21) (citing *Merck Manual of Diagnosis and Therapy* (19th ed. 2011) ("Malingering and other functional weakness is often characterized by give-way weakness, in which normal strength of effort suddenly gives way.')). If there is evidence of malingering, the ALJ does not need "clear and convincing" reasons to reject Petitioner's testimony about her physical condition and limitations. *See Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003) ("The ALJ could . . . reject [claimant's] testimony only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so."); *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" (internal citations omitted)). Instead, the credibility finding must be "supported by substantial evidence in the record," and the Court "may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

**MEMORANDUM DECISION AND ORDER - 20**

Third, the ALJ indicated that Petitioner's alleged pain notwithstanding, her prescribed medication was more-or-less effective at controlling her symptoms. (AR 30) (citing (AR 237) (Petitioner stating during February 1, 2005 visit with Donald J. Konrad, D.O., that "medication had been working quite well . . . ."); (AR 386) (Petitioner stating during June 9, 2006 visit with Ellen Judd, P.A., that her pain medications "do[ ] not get on top of [pain]" only "every once in a while.")). Such improvements in Petitioner's condition can constitute a clear and convincing reason not to credit fully her subjective symptom testimony. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility based on medical improvement); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

Finally, the ALJ considered Petitioner's daily activities in his credibility analysis. (AR 30) ("Further the significant activities of daily living the claimant reported doing at the July 2007 consultative exam do not appear consistent with the alleged severity of her pain and limitations."). If a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may question that claimant's allegations. *See Burch*, 400 F.3d at 681; *but see Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1149 (D. Or. 2009) ("[I]t is equally true that '[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits and many home activities are not easily transferable to what may be the more grueling environment of the workplace . . . .'" (citing *Fair*, 885 F.2d at 603)). Here, the extent of Petitioner's daily activities supports the ALJ's finding that Petitioner's reports of her impairment were not fully credible. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009); *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990) (finding that claimant's ability to "take care of her personal needs, prepare easy meals, do light

housework, and shop for some groceries . . . may be seen as inconsistent with the presence of a condition which would preclude all work activity."). The ALJ could properly note that Petitioner's ability to do daily activities such as occasional cooking, cleaning, shopping, and running errands was at odds with her testimony that she suffers from excruciating and debilitating pain nearly every single day. (AR 29-30) (citing AR 402-403); *see also supra* (testifying that, on average, she experiences pain level of 9-10 out of 10 daily).

Together, these reasons arguably offer clear and convincing explanations as to why the ALJ did not find Petitioner's testimony entirely credible. This is not to say, however, that this Court conclusively finds Petitioner not to be disabled under the applicable rules and regulations, or that Petitioner does not suffer from chronic pain; indeed, as expected, Petitioner identifies conflicting evidence in support of her position. While such conflicting evidence may not have been given the weight Petitioner would have preferred, the ALJ's decision to doubt Petitioner's credibility in denying disability benefits contains clear and convincing reasons for doing so. As required by controlling law, the ALJ will not be second-guessed here. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.") (internal citations omitted). Therefore, the Court will not substitute its judgment when the evidence in the record can support the ALJ's findings.

2.    Janet King's Opinion

On August 24, 2005, Janet King, R.N., N.P., completed a vocational rehabilitation form. (AR 354). Therein, Nurse King identified Petitioner's "disability" as (1) fibromyalgia, (2) pain

of back and legs; and (3) irritable bowel syndrome. *Id*. Nurse King then opined that Petitioner was "limited" in lifting, bending, stooping, reaching, pulling, pushing, sitting, standing, and kneeling; recommended that less strenuous employment be considered; understood Petitioner's condition to be permanent; and thought Petitioner's condition could not be "removed" with treatment. *Id*. However, Nurse King never expressed any actual restrictions associated with Petitioner's condition – to be sure, she left that designated section of the form (dealing with Petitioner's alleged lifting restrictions) altogether blank. *Id*. The ALJ accorded Nurse King's assessment "little weight because it does not set forth the claimant's specific limitations, it is not supported by explanation, and it is not from an acceptable medical source." (AR 28). Petitioner disagrees. *See* Pet.'s Brief, pp. 9-10 (Docket No. 19) ("The ALJ failed to properly consider the opinion of her treating nurse practitioner . . . . She is an acceptable medical and treating source whose opinion cannot be so easily dismissed.").

The Ninth Circuit has held that a treating physician's medical opinion is entitled to special consideration and weight. *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). The treating physician's opinion is entitled to such deference because "[s]he is employed to cure and has a greater opportunity to know and observe the individual." *Id*. Where the treating physician's opinions are not contradicted by another doctor, they may be rejected only for clear and convincing reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Even if the treating physician's opinions are contradicted by another doctor, they can only be rejected if the ALJ provides specific and legitimate reasons, supported by substantial evidence in the record, for doing so. *See id*.

While not commenting here on whether, in fact, Petitioner is disabled, it must be acknowledged that Nurse King's input on the vocational rehabilitation form is not without some

degree of ambiguity which, in turn, jeopardizes its utility.  First, to the extent Nurse King definitively considers Petitioner disabled, such an opinion on the ultimate issue here (at least as that term is used within the meaning of the Social Security Act) is neither conclusive nor binding upon the ALJ.  *See* SSR 96-5P, 1996 WL 374183, *2 ("The regulations provide that the final responsibility for deciding [whether an individual is 'disabled' under the Act] . . . is reserved to the Commissioner."); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."); 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .").  Second, Nurse King's opinions are, at best, incomplete toward determining the degree of Petitioner's alleged limitations and thus, whether she is capable of working at all.  Despite identifying a number of physical limitations (which may or may not be legitimate (*see supra*)), Nurse King does not identify in any quantifiable way how those limitations restrict Petitioner's ability to perform work-related tasks.  *See Carpender v. Astrue*, 2010 WL 4226577, *7 (D. Idaho 2010) ("Although there are places on the form where Dr. Smith could provide an explanation of his opinions regarding Petitioner's limitations, they were all consistently left blank.  ALJs may reject opinions that are in this format when they do not contain an explanation.") (citing *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (explaining that an ALJ may reject or give less weight to unexplained check-off reports).  Without more, the ALJ did not err in affording less weight to Nurse King's opinions and greater weight to other medical opinions offered in the record.

Simply put, the record illustrates that Petitioner suffers from several severe impairments (acknowledged by the ALJ (*see supra*)) that no doubt impact her ability to work; however, it cannot be said, as Petitioner does, that the "ALJ improperly discredited the opinion . . . of her long time treating nurse practitioner . . . ." *See* Pet.'s Brief, p. 9 (Docket No. 19). Accordingly, although Nurse King's assessment may not have been given the weight Petitioner believes was warranted, the ALJ did not consider it in a vacuum, independent of the surrounding medical record.

At this stage of the proceedings, it is not this court's duty to resolve the conflicting opinions and ultimately decide whether Petitioner is once-and-for-all disabled as that term is used within the Social Security regulations. Rather, this Court is tasked with determining whether the ALJ's decision in determining that Petitioner is not disabled is supported by the record. With this in mind, given the conflicting medical opinion, the ALJ need only offer specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Nurse King's medical opinions.[6] Because the evidence can reasonably support the ALJ's conclusion in these respects, this Court will not substitute its judgment for that of the ALJ's. *See Richardson*, 402 U.S. at 401; *Matney*, 981 F.2d at 1019.

## IV. CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts and determining credibility. *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational

---

[6] The undersigned makes no determination here on whether Nurse King is to be considered an "acceptable medical source" as questioned by the ALJ. *See supra*.

**MEMORANDUM DECISION AND ORDER - 25**

interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation for that of the ALJ. *Key*, 754 f.2d at 1549.

I am of the opinion that the evidence upon which the ALJ relied can reasonably and rationally support his well-formed conclusions, despite the fact that such evidence may be susceptible to a different interpretation. Accordingly, the ALJ's decisions as to Petitioner's disability claim generally, as well has his decisions concerning Petitioner's credibility and Nurse King's opinions specifically, were based on proper legal standards and supported by substantial evidence. Therefore, I conclude that the Commissioner's determination that Petitioner is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

Accordingly, the Commissioner's decision is affirmed.

## V.  ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action is DISMISSED in its entirety with prejudice.

DATED:  **January 2, 2014**

Honorable Ronald E. Bush
U. S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 26